UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JAMES ADAMS #823706,                          Case No. 2:20-cv-98

      Plaintiff,                              Hon. Paul L. Maloney
                                              U.S. District Judge
v.

UNKNOWN HARJU,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

### I.    Introduction

This Report and Recommendation (R&R) addresses Defendant Harju's motion for summary judgment (ECF No. 38) and Plaintiff Adams's motion for a temporary restraining order (ECF No. 48).

Plaintiff — state prisoner James Adams — filed suit pursuant to 42 U.S.C. § 1983 on July 1, 2020.  In his unverified complaint, Adams asserted that, while he was confined at the Baraga Correctional Facility (AMF) in Baraga, Michigan, he asked Qualified Mental Health Professional (QMHP) Harju to prescribe him mental health medication.  (ECF No. 1, PageID.3.)  In response, Harju allegedly denied Adams's request and told Adams to kill himself.  (*Id.*)  Adams further asserted that a mental health provider by the name of "Mike" falsified Adams's signature on a grievance form.  (*Id.*)  Adams said that Harju and Mike took these actions in retaliation for "what [Adams] did . . . at Marquette."  (*Id.*, PageID.4.)

In its screening opinion dated August 10, 2020, this Court construed Adams's claims as: (1) a deliberate indifference to serious medical needs claim against Harju, (2) a due process claim against Mike, and (3) a retaliation claim against both Harju and Mike.  (ECF No. 4, PageID.25-27 (Opinion).)  The Court then dismissed Adams's retaliation and due process claims.  (ECF No. 5, PageID.29 (Order).)

QMHP Harju now moves for summary judgment as to Adams's sole remaining claim:  that Harju acted with deliberate indifference to Adams's serious medical needs by telling Adams to kill himself and declining to prescribe Adams with mental health medication.  (ECF No. 38.)  QMHP Harju asserts that he is entitled to summary judgment because: (1) Adams has not provided medical records establishing that Adams received woefully inadequate mental health care, (2) Harju is not legally permitted to prescribe medication, and (3) Harju did not tell Adams to kill himself. (ECF No. 39, PageID.131-134.)

In addition, Adams moves this Court to issue a temporary restraining order requiring the Michigan Department of Corrections (MDOC) to transfer him to a new facility.  (ECF No. 48.)  Adams says that AMF officers have been threatening to send him to segregation and make his life "a living hell" if Adams does not drop this lawsuit.  (*Id.*, PageID.325.)

The undersigned respectfully recommends that the Court grant Harju's motion for summary judgment because: (1) there are no genuine issues of material fact, (2) Harju did not infer a serious psychological need during his May 4, 2018 visit with Adams, (3) once Adams's risk of self-harm or suicide became apparent, Harju

2

provided Adams with mental health care, and (4) Adams has not shown that he was provided with inadequate mental health care.  As such, Harju is entitled to judgment. The undersigned further recommends that the Court deny Adams's motion for a temporary restraining order because Adams has not shown a substantial likelihood of success on the merits or that the denial of his motion will result in irreparable injury, and an order interfering with the MDOC's administration of its prisons would not serve the public interest.

## II.    Factual Allegations

In a verified declaration, Adams says that as of May of 2018, he was experiencing depression, anxiety, blackouts, anger, personality disorder, and other mental health-related conditions.  (ECF No. 42-5, PageID.299.)

On May 4, 2018, Adams says that QMHP Harju stopped by his cell.  (*Id.*, PageID.300.)  Adams says that he told Harju that he was having problems and needed help.  Adams told Harju that he "felt harm."  According to Adams, Harju responded by telling Adams: "You don't have nothing coming, go kill yourself."  (*Id.*)   After this interaction with Harju, Adams says that he could hear Harju's statement repeating in his head.  (*Id.*)  Adams says that he felt useless, unwanted, and like he did not have anything to live for, so on May 10, 2018, Adams cut his wrist.  Adams says that the wound required fourteen stitches and that he was placed on suicide watch.  (*Id.*)

In another verified declaration, state prisoner Stanley Gibbs says that on May 4, 2018, he watched Harju stop at Adams's cell.  (ECF No. 42-6, PageID.302.)  Gibbs says that he heard Harju tell Adams to go kill himself and that Harju was not going

to help Adams get back on his medications because of what Adams did to an officer at another facility. (*Id.*)

In contrast, QMHP Harju states in an affidavit that he never told Adams to kill himself or refused to provide Adams with mental health services. (ECF No. 39-2, PageID.141.) Harju says that in May of 2018, Adams repeatedly requested medications, but that staff determined that Adams "did not exhibit signs of psychosis or a major mental illness requiring psychotropic medications." (*Id.*) Harju further states that "in an abundance of caution" he referred Adams for a comprehensive psychiatric evaluation. (*Id.*) Harju adds that because he is a Licensed Master Social Worker (LMSW), and not a licensed psychiatrist, he cannot prescribe psychotropic medications. (*Id.*, PageID.140-141.)

## III.    Adams's Medical Records

Both parties provided the Court with medical records. Because the records overlap, the undersigned cites only to the records provided by QMHP Harju.

On March 1, 2013, Adams underwent his first psychiatric evaluation in MDOC custody. (ECF No. 39-3, PageID.194.) The evaluation was conducted by Dr. David J. Forsythe. Forsythe noted that prior to Adams's commitment to MDOC custody, a doctor had prescribed Adams with Wellbutrin and Seroquel. (*Id.*) But on February 13, 2013, Adams was caught "cheeking"[1] the Wellbutrin. He continued cheeking the medication until another doctor discontinued both the Wellbutrin and the Seroquel on February 20, 2013.

---

[1]    In other words, Adams was pretending to swallow the medication.

4

Adams reported that he was prescribed the medications at the Wayne County Jail after he complained of his inability to sleep or focus.  (*Id.*)  Adams said that he began cheeking the Wellbutrin because he did not want it, but was told that he had to take it, or he would be put in segregation.  (*Id.*, PageID.195.)  Adams said that he never tried to trade, sell, or otherwise misuse the medication; he simply did not want to take it.

During the evaluation, Adams reported that he was prescribed Ritalin and Concerta for Attention-Deficit/Hyperactivity Disorder when he was seventeen, but that he had not taken psychotropic medication since (that is, until he was prescribed Wellbutrin and Seroquel at the Wayne County Jail).  (*Id.*)

When asked about psychiatric disorders or symptoms, Adams denied experiencing "persistent sleeping difficulties, anhedonia, anergia, dysphoria, diurnal variation in mood, hopelessness, worthlessness, helplessness, thoughts death, dying, or suicide."  (*Id.*)  Dr. Forsythe noted no history of psychoticism including hallucinations or delusions, and no family history of psychiatric disorders, hospitalization, or suicide.

Dr. Forsythe diagnosed Adams with Cannabis Dependence, and Anti-social Personality Disorder.  (*Id.*, PageID.197.)  Forsythe recommended substance abuse treatment but determined that Adams did not need to be placed in an outpatient treatment program.  (*Id.*)

Adams's medical records then jump to April 16, 2018.  On that date, QMHP Michael Beaudoin visited Adams after Adams asked for medication to manage his

sadness and the voices inside his head. (*Id.*, PageID.144.) Beaudoin noted that that while Adams said that he constantly heard voices in his head, Adams could not describe the voices. At the time, Adams did not express suicidal ideation, or present with symptoms of a major mood disorder. (*Id.*, PageID.145.)

On May 4, 2018, QMHP Harju visited Adams in segregation. (*Id.*, PageID.147.) Harju noted that Adams did not appear to be experiencing internal stimuli despite Adams's reports that he was hearing voices, and that Adams did not present symptoms of a major mood disorder. The record reflects that Adams denied experiencing suicidal or homicidal ideation, as well as any intent to harm himself or others. (*Id.*)

But on May 7, 2018, it appears that Adams's situation began to deteriorate. (*Id.*, PageID.149.) Adams again requested medication and began implying that if he did not receive medication, someone would get hurt. Adams claimed that Bupropion (Wellbutrin) previously helped him with the voices in his head, but QMHP Harju noted that Bupropion is not an antipsychotic and that Adams's records demonstrate that Adams was not actually taking the medication when it was prescribed. (*Id.*) Adams also said that he could not sleep, but when Harju tried to talk to Adams about sleep hygiene, Adams dismissed Harju. Harju noted that Adams had provided QMHPs at AMF with contradictory accounts of the symptoms that he was experiencing. (*Id.*) Although Adams implied that he would hurt someone if he was not put on medication, Harju reported that Adams did not express suicidal or

6

homicidal ideation. (*Id.*, PageID.150.)   Harju also noted that there was no overt evidence of psychosis or signs of a major mood disorder.  (*Id.*, PageID.149.)

On May 10, 2018, Adams began engaging in self-harm, using a razor to cut his wrist while taking a shower.  (*Id.*, PageID.153.)  Adams initially claimed that he did not know who cut him.  The cut required sutures, but the nurse practitioner who treated the wound determined that the cut was superficial.  (*Id.*)  When QMHP Harju visited Adams, Adams refused to speak with him.  Harju noted that a prisoner across the hall from Adams had recently received a "ride out"[2] for engaging in behavior similar to Adams's, but nevertheless determined that Adams was at a moderate risk of committing suicide.  (*Id.*)  At this point, Harju issued a Mental Health Management Plan for Adams, stating that Adams was at moderate risk of suicide or self-injury, and needed to be placed in an observation cell.  (*Id.*, PageID.151.)  The plan mandated one-on-one supervision of Adams while showering and brushing his teeth and directed officials not to give Adams any sharp objects.  (*Id.*)

Adams attempted to harm himself again on May 11, May 13, and May 15, 2018. (*Id.*, PageID.155-160.)  On May 11, Adams used a staple he found in his observation cell.  (*Id.*, PageID.155.)   On May 13, 2018, Adams used a lid from a juice cup.  (*Id.*, PageID.160.) And on May 15, 2018, Adams rubbed his wrist until he developed an abrasion.  (*Id.*, PageID.160.)  Harju evaluated Adams's risk of suicide and self-harm on May 11, May 14, and May 15, noting that there was no evidence of psychosis.  (*Id.*, PageID.155, 158, 160.)

---

[2]    Presumably, a transfer to another facility.

On May 11 and May 14, staff informed QMHP Harju that Adams was eating and sleeping normally.  (*Id.*, PageID.155, 158.)  During the May 14 visit, Adams reported that he wanted to kill himself.  (*Id.*, PageID.157.)  He also reported that the voices in his head were instructing him to hurt himself, and that he was not responsible for any of his behavior since entering into MDOC custody.  Adams again requested medication to "help [him] do his time." (*Id.*, PageID.158.)

During the May 15 visit, staff informed Harju that Adams refused to comply with security demands or take his antibiotics.  (*Id.*, PageID.160.)  Staff also told Harju that Adams's behavior was being influenced by a gang member in Adams's housing unit.  Adams told Harju that if Adams did not get his medication, someone would die. Harju noted that Adams was not exhibiting signs of psychosis, but that he was exhibiting anti-social traits during this visit.  (*Id.*)

On May 16, 2018, Adams began a hunger strike.  (*Id.*, PageID.162.)  QMHP Beaudoin visited Adams's cell and attempted to speak with him, but Adams told Beaudoin that there was nothing to talk about.  When QMHP Harju visited Adams on May 17, 2018, Adams dismissed him as well.  (*Id.*, PageID.164.)  Harju noted that Adams did not present signs of a major mood disorder or psychosis during this visit. Nursing staff told Harju that Adams attributed his refusal to eat to the voices in his head.  (*Id.*)

On May 18, 2018, Adams began eating again.  (*Id.*, PageID.166.) When QMHP Harju visited Adams, Adams began threatening Harju and calling him names.  (*Id.*) Adams reiterated that if he did not get medications soon, someone would get hurt.

Harju told Adams that Harju was going to refer Adams for a comprehensive psychological examination, which seemed to calm Adams down.  (*Id.*, PageID.167.) Harju noted that Adams did not present signs of psychosis, and that there was no indication that Adams was responding to internal stimuli during this interaction. (*Id.*)

QMHP Harju continued evaluating Adams's risk of committing suicide over the course of the next few weeks.  Harju visited Adams on May 20, May 22, May 24, May 30, and June 1, 2018.[3]  (*Id.*, PageID.168-176, 205-210.)  Though Adams was no longer engaging in self-harm, Adams continued to report experiencing hallucinations and suicidal ideation through May 30, 2018.  (*Id.*, PageID.168, 170, 172, 176, 177.) But Harju noted that there were no overt signs of distress or psychosis during these visits.  (*Id.*) On June 1, 2018, Adams reported that he was no longer experiencing hallucinations or the desire to harm himself.  (*Id.*, PageID.205.)  Adams noted that there were no signs of psychosis, or major mood disorder during this visit.  (*Id.*, PageID.210.)  Because Adams "contract[ed] for safety," Harju moved Adams from moderate risk to intermediate risk of self-harm or suicide and issued a new Mental Health Management Plan.  (*Id.*, PageID.208, 210.)

Meanwhile, Adams was seen by Dr. Robert Niven on May 31, 2018 for a psychiatric evaluation.  (*Id.*, PageID.201-203.)  During the evaluation, Adams said that he was feeling down and angry about his sentence, that he was hearing voices,

---

[3]    QMHP Beaudoin also visited Adams on May 30, 2019.  (ECF No. 39-3, PageID.176.)

and that he had been blacking-out a lot.  (*Id.*, PageID.201.)  Adams reported that the voices began before he came to prison.  (*Id.*, PageID.202.)  Niven noted that Adams's responses throughout the evaluation were often vague.  (*Id.*)  Niven also noted that there was no evidence that Adams was experiencing internal stimuli during the evaluation.  (*Id.*, PageID.203.)  Adams did not report suicidal or homicidal ideation. Niven determined that it was "highly doubtful" that Adams was experiencing auditory hallucinations, and "highly likely" that Adams was fabricating some of his symptoms.  (*Id.*)  Niven considered many of the records summarized above, including Adams's psychiatric evaluation from 2013.  When Niven told Adams that he was going to administer a psychological test at some point in the future, Adams complained about not receiving medication in the meantime.  (*Id.*)  Niven pointed out that Adams had not received mental health medication in over five years.

## IV.    Harju's Motion for Summary Judgment (ECF No. 38)

The undersigned first addresses QMHP Harju's motion for summary judgment.  Harju argues that he is entitled to summary judgment because Adams has not established that Harju provided him with grossly incompetent treatment, Harju is not authorized to prescribe medication, and Harju never told Adams to commit suicide.  (ECF No. 39, PageID.131-135.)

### a.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).  The standard for determining whether

summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### b. Deliberate Indifference

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  It obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  This includes a prisoner's serious psychological needs, "especially when they result in suicidal tendencies."  *Comstock*, 273 F.3d at 703 (quoting *Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).  A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that

he is incarcerated under conditions posing a substantial risk of serious harm. *Id.*

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

To succeed on a claim of deliberate indifference, a prisoner who has received medical attention "must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting A*lspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). And the prisoner must place medical evidence into the record verifying the detrimental effect of the inadequate treatment. *See Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (establishing that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on treatment delay); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004) (explaining that a plaintiff must submit verifying medical evidence when the medical need is non-obvious or the claim is based on inadequate treatment).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). There, the court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.
>
> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.
>
> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some

treatment for the inmates' medical needs." But there is a high bar that
a plaintiff must clear to prove an Eighth Amendment medical-needs
claim: The doctor must have "consciously expos[ed] the patient to an
excessive risk of serious harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

Adams alleges that QMHP Harju was deliberately indifferent to his
psychological needs by telling Adams to go kill himself on May 4, 2018, and by failing
to provide Adams with psychotropic medication. (ECF No. 1, PageID.3.)

Adams's medical records reflect that Adams engaged in self-injurious behavior
several times from May 10, 2018 to May 18, 2018. (ECF No. 39-3, PageID.153-166.)
From May 10, 2018 to May 29, 2018, Adams reported experiencing suicidal ideation.
(*Id.*, PageID.153-176.) As recognized above, psychological needs manifesting in
suicidal tendencies constitute serious medical needs. *Comstock*, 273 F.3d at 703;
*Horn by Parks*, 22 F.3d at 660; *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d
472, 482-83 (6th Cir. 2020) ("A plaintiff meets the objective prong of the Eighth
Amendment analysis by showing that the inmate showed suicidal tendencies during
the period of detention.").

But even accepting that Adams had serious psychological needs in May of 2018,
Adams has not shown that QMHP Harju was aware of those needs as of the May 4,
2018 visit. The record reflects that prior to the May 4 visit, Adams had only
complained of feeling sad and hearing voices on one occasion. (ECF No. 49-3,
PageID.144.) During that visit, Adams did not display suicidal ideation. (*Id.*) And
Adams does not assert that he had a history of self-harm or suicide attempts that
gave Harju notice of his suicidal tendencies. *See, e.g., Troutman*, 979 F.3d at 485

14

(explaining that the subjective component of a deliberate indifference claim based in suicidal tendencies "typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm" (citing *Grabow v. Cnty. of Macomb*, 580 F. App'x 300, 308-09 (6th Cir. 2014))).  Instead, Adams says that he told Harju during the May 4 visit that he was "having problems" and "felt harm."  (ECF No. 42-5, PageID.300.)  In the opinion of the undersigned, these facts are insufficient to create a genuine issue as to whether Harju was aware of Adams's serious psychological needs on May 4, 2018.  As such, although Harju's alleged statement to Adams was lamentable,[4] the undersigned finds that it was not made in deliberate indifference to Adams's serious psychological needs.

Furthermore, Adams's medical records for the dates following May 4, 2018 show that once QMHP Harju was aware of Adams's serious psychological needs, Harju acted swiftly in providing Adams with care.   On May 10, 2018, Harju implemented a Mental Health Management Plan requiring staff members to check on Adams every fifteen minutes.  (ECF No. 39-3, PageID.153.)  This plan remained in effect through June 1, 2018.  (*Id.*, PageID.151, 208.)  From May 10, 2018 to June 1, 2018, Harju visited Adams at least fifteen times.  (*Id.*, PageID.153-210.)  During

---

[4]     While Harju contends that he never told Adams to kill himself, (ECF No. 39-2, PageID.141), thereby creating an issue of fact, the undersigned finds that issue is immaterial, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").

15

these visits, Harju closely monitored Adams's symptoms.  Harju repeatedly noted that despite Adams's claims that he was hearing voices, Adams did not appear as though he was responding to internal stimuli.  (*Id.*, PageID.147, 153, 155, 160, 168, 172.)  Nor did Adams display signs of psychosis or a major mood disorder.  (*Id.*, PageID.149, 155, 158, 160, 164, 174, 177, 210.)  But even so, Harju referred Adams to Dr. Niven for a psychiatric examination.  (*Id.*, PageID.201-203.)

Put simply, the records demonstrate that QMHP Harju was diligent in proving Adams with mental health care once he was made aware of Adams's serious psychological needs.  And, as Harju points out, Adams has not provided the Court with any evidence that the care was so inadequate as to constitute no care at all. Adams may believe that he should have received mental health medication, but Harju was not qualified to prescribe that medication.[5]  And even if he was qualified to prescribe that medication, differences in judgment between a prisoner and a medical professional do not state a claim of deliberate indifference.  *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).  As such, the undersigned respectfully recommends that the Court grant QMHP Harju's motion for summary judgment.

## V.        Qualified Immunity

QMHP Harju also argues that he is entitled to qualified immunity because he did not violate Adams's clearly established rights.  (ECF No. 39, PageID.135, 136.)

---

[5]      Harju is a Licensed Master Social Worker (LMSW).  (ECF No. 29-2, PageID.141.)  As an LMSW, Harju does not have the legal authority to prescribe medications.  (*Id.*)

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court

17

considers the state of the law at the second step.   As the Supreme Court has observed,

"this Court's case law does not require a case directly on point for a right to be clearly

established, [but] existing precedent must have placed the statutory or constitutional

question beyond debate."   *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal

quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 136 S. Ct.

305, 308 (2015)).   As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'"

18

*Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

Because the undersigned finds that there are no genuine issues of material fact and that QMHP Harju did not act with deliberate indifference to Adams's serious psychological needs, the undersigned concludes that Harju is entitled to qualified immunity at this stage.

## VI.    Adams's Motion for a Temporary Restraining Order (ECF No. 48)

The undersigned now turns to Adams's motion for a temporary restraining order.  (ECF No. 48.)  There, Adams asks this Court to "demand a transfer" because AMF staff have been threatening to send Adams to segregation if he does not drop this lawsuit.  (*Id.*, PageID.325.)

Injunctive relief is "one of the most drastic tools in the arsenal of judicial remedies."  *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)).  The issuance of preliminary injunctive relief is committed to the discretion of the district court.  *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000).  In exercising that discretion, a court must balance the following factors: (1) whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the plaintiff has shown irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing a preliminary injunction.  *United States v. Szoka*, 260 F.3d 516, 523

19

(6th Cir. 2001); *Washington v. Reno*, 35 F.3d 1093, 1098 (6th Cir. 1994); *Higgs v. Bland*, 888 F.2d 443, 448 (6th Cir. 1989).

These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also Ne. Ohio Coal.*, 467 F.3d at 1009. Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432, 438 n.3 (6th Cir. 1984). The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

The undersigned has carefully considered these factors and respectfully recommends that the Court deny Adams's motion for a temporary restraining order. Considering the undersigned's recommendation that this Court grant Harju summary judgment and dismiss Adams's claims, Adams has not established a strong or substantial likelihood of success on the merits of his claim. Further, Adams has not shown that he will suffer irreparable harm if the Court denies his motion. A plaintiff's harm from the denial of preliminary injunctive relief is irreparable only if it is not fully compensable by monetary damages. *See Overstreet*, 305 F.3d at 578.

Adams simply asserts that he "feels that all this will result in retaliation" and that the prison staff are threatening to place him in segregation. (ECF No. 48, PageID.325.) Perhaps most significantly, the public interest would not be served by an order that interferes with the MDOC's administration of its prisons.

## VII.  Recommendation

The undersigned respectfully recommends that the Court grant Harju's motion for summary judgment because: (1) there are no genuine issues of material fact, (2) Harju did not infer a serious psychological need during his May 4, 2018 visit with Adams, (3) once Adams's risk of self-harm or suicide became apparent, Harju provided Adams with mental health care, and (4) Adams has not shown that he was provided with inadequate mental health care. As such, Harju is entitled to judgment. The undersigned further recommends that the Court deny Adams's motion for a temporary restraining order because Adams has not established that his claims have a strong likelihood of success on the merits or that the denial of his motion will result in irreparable injury and issuing an order interfering with the MDOC's administration of its prisons would not serve the public interest.

Date: August 26, 2022                          /s/ *Maarten Vermaat*
                                                 MAARTEN VERMAAT
                                                 U.S. MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).